**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KELLIE ANN VAN PELT,**                    CASE NO. 1:19 CV 2844

      Plaintiff,

                           JUDGE JAMES R. KNEPP II

      v.

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                    **MEMORANDUM OPINION AND
ORDER**

### INTRODUCTION

Plaintiff Kellie Ann Van Pelt ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). For the reasons stated below, the Court affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in August 2016, alleging a disability onset date of December 19, 2014. (Tr. 150-54). Her claims were denied initially and upon reconsideration. (Tr. 79, 92). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on September 14, 2018. (Tr. 30-66). On October 29, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 16-24). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on December 9, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

<u>Personal Background and Testimony</u>

Born in 1970, Plaintiff was 44 years old on her alleged onset date. *See* Tr. 150. She has a high school education (Tr. 39) and previously worked at a fast-food restaurant and as a cleaner (Tr. 41-43).

At the time of the hearing, Plaintiff had recently moved into a house with her boyfriend; she previously lived with her boyfriend's parents for seven years. (Tr. 37). In her boyfriend's parents' three-story home, Plaintiff went up and down the stairs twenty to thirty times per day. (Tr. 37-38). She used a cane "just on . . . bad days" (three to five times per week). (Tr. 38).

Plaintiff believed she could not work due to dizziness, fatigue, depression, pain in her whole body (from her hips to her feet, specifically), and swelling in her hands. (Tr. 43-44, 46). Her dizziness caused her to walk into walls. (Tr. 45). Plaintiff took Plaquenil for lupus and Lyrica for pain. (Tr. 44). Standing caused foot numbness; she wore compression socks frequently, but was not wearing them at the hearing. *Id.* As to her hands, Plaintiff did not drop things or have difficulty writing or typing; she could make a fist, but not a tight fist. (Tr. 46-47).

Plaintiff estimated she could stand for ten to fifteen minutes before having to sit down and walk was "[m]aybe a half an hour with . . . straining". (Tr. 45). On a bad day, Plaintiff could sit for fifteen to twenty minutes before needing to stand up, walk, or lie down; on a good day, she could sit for thirty minutes. (Tr. 54). Plaintiff could not kneel or crawl because she could not get back up. *Id.* Her frozen shoulder also caused difficulties reaching out straight and up on a bad day. *Id.* She could lift a gallon of milk out of the fridge, but "it's a little heavy". (Tr. 53). However, she could do so repetitively throughout a day. (Tr. 54).

Plaintiff cooked simple recipes (taking breaks), grocery shopped with her boyfriend, washed some dishes, and cleaned (with help from her boyfriend). (Tr. 49, 56). She also did laundry, though her boyfriend carried it up and down the stairs. (Tr. 50).

Plaintiff had a history of multiple foot surgeries, and wore diabetic house slippers. (Tr. 49). Plaintiff said she put her feet up "all the time" to alleviate her pain. (Tr. 49-50). When asked to clarify, "What's all the time?", she responded, "[l]ike every night for about an hour." (Tr. 50).

At the time of the hearing, Plaintiff planned to travel to a family reunion three hours away by car; her boyfriend would drive. (Tr. 51). Earlier that year, Plaintiff traveled to Florida for eleven days (by plane) to visit her sister. (Tr. 51-52). She went to Disney World, Aquatica (a water park), and Sea World. (Tr. 52). Plaintiff took a walker, and was in a wheelchair for part of the trip. *Id.* The wheelchair and walker were not prescribed. *Id.* Plaintiff had a handicap placard prescribed by Dr. Anderson. (Tr. 53).

<u>Relevant Medical Evidence</u>

In February 2015, Plaintiff underwent surgery to remove a bone tumor in her right foot. *See* Tr. 346. On examination one week post-operatively, Stacie Anderson, DPM, noted Plaintiff had moderate edema. *Id.*

In March 2015, Plaintiff saw her primary care physician, Ghai Lu, M.D., twice. *See* Tr. 1321-28. Plaintiff reported a deep vein thrombosis (DVT) following her surgery and intermittent pain and swelling in her leg. (Tr. 1321, 1325).

Later that month, Plaintiff returned to Dr. Anderson for a five-week post-operative follow up. (Tr. 337). She had decreased edema and "[m]inimal pain to dorsum right foot". (Tr. 338). Dr. Anderson repeated these findings at two visits in April. (Tr. 335, 332). Dr. Anderson first instructed Plaintiff begin full weight bearing in a CAM walker (Tr. 337), then in regular shoes

(Tr. 335). In May, Plaintiff told Dr. Anderson she had more swelling in her right foot. (Tr. 328). On examination, Dr. Anderson noted "[m]ild" edema, and "[m]inimal pain to dorsum right foot"; she instructed Plaintiff to continue full weight bearing. (Tr. 329). In June, Plaintiff was "[d]oing well" with no swelling and wearing regular shoes. (Tr. 325). She complained of pain in her left foot. *Id.* She had no edema in her right foot, but pain along the base of the third metatarsal, dorsum left foot. (Tr. 326). Dr. Anderson reviewed Plaintiff's prior imaging and diagnosed a bone cyst; she recommended surgery. *Id.* In July, Plaintiff reported right ankle pain. (Tr. 322). On examination, Dr. Anderson observed no edema or varicosities, but pain along the right ankle peroneal tendons and pain in the dorsum left foot. (Tr. 323). She diagnosed tendonitis and recommended an ankle brace and continued anti-inflammatory medication. *Id.*

Plaintiff underwent surgery on her left foot bone cyst in August 2015. *See* Tr. 320. In September, Plaintiff was "[d]oing well" and in a CAM walker. (Tr. 317). Dr. Anderson instructed her to begin weight bearing. (Tr. 318).

In October 2015, Plaintiff saw Dr. Lu about bilateral leg numbness and tingling while in bed. (Tr. 1299). Dr. Lu observed a normal gait and pretibial edema. (Tr. 1302). A few days later, Plaintiff told Dr. Anderson she had restless legs and leg pain waking at night. (Tr. 311). Plaintiff had left foot edema, but she was neurologically grossly intact. *Id.* Dr. Anderson diagnosed bilateral foot pain, prescribed a topical compound, and ordered lab work to check for rheumatoid arthritis. (Tr. 312). In November, Plaintiff said her left foot was doing well, with some increased pain the past few days. (Tr. 307). She had pain in the second to fifth metatarsals of the left foot MP joints, and "[m]inimal" edema. (Tr. 308).

In December, Plaintiff reported continued leg pain to Dr. Lu. (Tr. 1267). Later that month, Dr. Anderson observed Plaintiff had diffuse pain in her midfoot bilaterally, and continued

pain in her hip joints. (Tr. 304). Dr. Anderson noted a bone scan showed only prior surgical sites and midfoot joints. (Tr. 303).

In January 2016, Plaintiff told Dr. Lu she developed heart palpitations after a cortisone injection to her knee; her knee still hurt. (Tr. 1262). Dr. Lu observed a normal gait. (Tr. 1266).

At a March 2016 follow up appointment, Plaintiff described increased right foot pain, but her left foot was "doing better". (Tr. 296). Dr. Anderson noted similar findings to Plaintiff's December 2015 appointment and advised Plaintiff to consider pain management. (Tr. 297). Later that month, Plaintiff told Dr. Lu some of her medications helped, and she was "[f]eeling all right except for various pains [including] [right lower extremity] which has a walking boot on." (Tr. 1235). Dr. Anderson made similar observations in April 2016 as in March. *See* Tr. 292-94.

In May 2016, Plaintiff saw rheumatologist Ali Askari, M.D., for treatment of her Sjogren's syndrome and possible complex regional pain syndrome ("CRPS"). (Tr. 493-97). Plaintiff described muscle pain in her legs, morning stiffness lasting fifteen to thirty minutes, and worsening pain with activity. (Tr. 493). On examination, she had good knee range of motion with mild swelling, mild ankle swelling, and "[e]xtreme tenderness to touch" in her legs. (Tr. 497). Dr. Askari diagnosed sore muscles, refilled prescriptions, and ordered lab work. *Id.*

Plaintiff returned to Dr. Anderson in May, reporting her right foot was worse. (Tr. 286). An MRI showed recurrence of enchondroma in the left third metatarsal and a new lesion on the fourth metatarsal. (Tr. 288). Examination revealed pain along the right foot fourth metatarsal, and mild pain to dorsum left foot. *Id.* In June, Plaintiff was "[d]oing better", but had continued pain in her right foot and both second toes. (Tr. 282). Dr. Anderson made similar observations, adding "contracted digits 2-5" in both feet, but pain only in the second digit. (Tr. 284). She discussed ongoing pain management, and possible future surgery for the right foot. *Id.*

Plaintiff returned to Dr. Lu in July, reporting, *inter alia*, increased foot swelling. (Tr. 1228). Dr. Lu observed Plaintiff to have a normal gait (Tr. 1232) and adjusted her medications (Tr. 1233).

Plaintiff then underwent surgery on her right foot for hammertoe correction and enchondroma excision. *See* Tr. 271, 992. At an August 2016 follow-up visit, she told Thomas Depolo, DPM, her pain was "moderate to severe"; she attended a car show the prior day, which caused increased pain. (Tr. 271). Later that month, with pain management physician David Ryan, M.D., Plaintiff described eight to nine out of ten bilateral foot and leg pain to pain management physician David Ryan, M.D. (Tr. 992). Plaintiff said the pain was constant; Percocet helped slightly, and walking worsened her pain. *Id.* Dr. Ryan observed Plaintiff "ha[d] a picture consistent with fibromyalgia." *Id.* He also said Plaintiff had severe pain, but was doing relatively well compared to previous foot surgery. (Tr. 994). Dr. Ryan diagnosed CRPS of the right lower limb, but noted Plaintiff was not in a CRPS flare; he prescribed medication. (Tr. 994-95).

Plaintiff returned to Dr. Ryan's office in September, reporting bilateral leg and low back pain "as well as all over pain"; she rated her pain as seven out of ten. (Tr. 997). Julie Such, CNP, noted Plaintiff "has had slightly improving course." *Id.* Plaintiff reported her right foot pain increased since her surgery and she had numbness in her right big toe. *Id.* On examination, Plaintiff was wearing a surgical shoe on her right foot, and had eighteen out of eighteen fibromyalgia tender points. (Tr. 999). Ms. Such adjusted Plaintiff's medications. (Tr. 999-1000).

Later that month, Plaintiff returned to Dr. Anderson, reporting her right foot was still painful and swollen from the surgery, but her bone tumor site was doing well. (Tr. 255). On examination, she had edema to the right second digit and her foot was contracted at the DIP

joint. (Tr. 256). Dr. Anderson said she would consider revisional surgery if Plaintiff had no improvement, and that Plaintiff should follow up to discuss surgery on the left foot. *Id.*

Plaintiff returned to Dr. Askari's practice the following week reporting slight improvement, "although the muscle pains and pain sensitivity in her lower extremities" persisted. (Tr. 471)[1]. She had "slight" swelling in her knees and right ankle. (Tr. 471); *see also* Tr. 476 (noting "mild" swelling in bilateral knees with "some pain at right at total flexion", "mild" swelling in bilateral ankles, extreme tenderness to touch in lower extremities, and soft tissue tenderness in the paracervical, paraspinal, and thigh muscles). Dr. Ahmad diagnosed lupus, fibromyalgia, and knee chondrocalcinosis. (Tr. 481). He adjusted medications, ordered lab work, and instructed Plaintiff to continue following with pain management. *Id.*

In October, Plaintiff told Dr. Anderson she was "[d]oing better", and ready for surgery on her left foot, which was "very painful". (Tr. 1134). Dr. Anderson scheduled surgery. (Tr. 1135).

In November and December, Plaintiff returned to Ms. Such, reporting all over body pain that she rated as nine out of ten, and seven out of ten. (Tr. 1001, 1005). She specifically described pain in her feet. *Id.* Ms. Such again noted eighteen out of eighteen fibromyalgia tender points, and adjusted Plaintiff's medications. (Tr. 1002-03, 1006-07).

Plaintiff followed-up with Dr. Anderson after her surgery in December. (Tr. 1130-31). Dr. Anderson noted mild edema and rectus alignment of the second digit. (Tr. 1130). Later that month, Plaintiff described foot swelling with pain up her calf. (Tr. 1126). On examination, Dr. Anderson noted edema of Plaintiff's left foot and ankle; she ordered an ultrasound. (Tr. 1128). The ultrasound was negative. *See* Tr. 1121.

---

1. Plaintiff saw Hassan Ahmad, M.D., with attending physician, Dr. Askari. *See* Tr. 483.

The following month, Dr. Anderson observed "[i]mproved edema" and the second digit on Plaintiff's right foot remained contracted at the DIP joint, but it was not painful. (Tr. 1123). She was instructed to continue with rest, ice, and elevation. *Id.* In February, Plaintiff said her toes were doing well, but she had pain on the outside of both feet. (Tr. 1119). On examination, Dr. Anderson observed Plaintiff had pain in her lateral foot bilaterally as well as in her fourth and fifth metatarsals. (Tr. 1120). She referred Plaintiff to physical therapy. *Id.*

At a February 2017 visit with Dr. Askari, Plaintiff reported extreme fatigue and pain in different joints. (Tr. 462). On examination, Plaintiff had normal gait and strength, no synovitis in her knees and ankles, and good range of motion in her hips. (Tr. 467-68).

In March, Plaintiff returned to Dr. Ryan complaining of pain in both feet, both legs, her lower back, and both shoulders; she rated the pain as seven out of ten. (Tr. 1009). On examination, Plaintiff had tenderness in the lateral part of her left foot, and eighteen out of eighteen fibromyalgia tender points. (Tr. 1011). Dr. Ryan adjusted Plaintiff's medications. (Tr. 1012-13). He further wrote that Plaintiff had rheumatoid arthritis in her knees, with early degenerative changes detected on an x-ray. (Tr. 1011-12).

Later that month, Plaintiff told Dr. Anderson both of her second toes were painful and swollen and her right foot was starting to hurt again. (Tr. 1116). Dr. Anderson observed "[i]mproved edema", rectus alignment of left foot second toe ("swollen"), right foot second toe "remains contracted at DIP [joint], not painful today", pain in lateral foot bilaterally, and pain along the fourth and fifteen metatarsals. (Tr. 1118). Dr. Anderson noted she would "try different inserts", "[a]dvised on wide shoe gear", consider an MRI, and provide a prescription for a Medrol dose pack. *Id.* In April, Plaintiff reported pain in her right foot; over-the-counter inserts "were working well", but she had sharp pain on the outside of her foot. (Tr. 1113). Plaintiff had

pain along her right foot peroneal tendon, and a hammertoe second digit with decreased edema in both feet. (Tr. 1115). Dr. Anderson instructed Plaintiff to continue range of motion exercises for her toes, continue with over-the-counter inserts, and ordered new diabetic shoe gear. *Id.*

In May 2017, Plaintiff described "pain all over", predominantly in her bilateral thighs and knees, to Dr. Ahmad. (Tr. 1069). On examination, Plaintiff had joint hypermobility, mild knee swelling, good knee range of motion "with some pain at right at total flexion", mild ankle swelling, and no ankle pain. (Tr. 1072). She also had soft tissue tenderness in her thighs and back. *Id.* Dr. Ahmad continued to diagnose, *inter alia*, fibromyalgia; he prescribed a Medrol dose pack for arthralgias and knee swelling. (Tr. 1073-74). He encouraged Plaintiff to "gradually increase aerobic activity", noting "has fitbit, doing 3000 steps daily with plans to go up by 500 steps every 1-2 weeks." (Tr. 1074).

In June, Plaintiff returned to Ms. Such, reporting six out of ten bilateral leg and right knee pain. (Tr. 1014). Plaintiff complained of knee pain, greater on the right, increasing pain in her right foot, and "whole-body pain". *Id.* On examination, Plaintiff's extremities were "nonedematous". (Tr. 1015). She continued to have eighteen out of eighteen fibromyalgia tender points. (Tr. 1016). Ms. Such adjusted Plaintiff's medications, prescribing Lyrica. *Id.*

In July, Plaintiff returned to Dr. Anderson with left foot swelling. (Tr. 1110). On examination, Plaintiff had left-sided calf pain, edema dorsum left foot, and pain along the second through fourth metatarsals. (Tr. 1112). Dr. Anderson ordered an ultrasound, and prescribed a Medrol dose pack. *Id.* The following month, Plaintiff reported pain in the small toes of both feet. (Tr. 1107). On examination, Plaintiff was neurologically intact, but had painful hammertoes at her third, fourth, and fifth digits on both feet; her second digits were "doing okay". (Tr. 1109). Dr. Anderson "[d]ispensed crest pad to try" and instructed Plaintiff to follow up "as needed". *Id.*

Also in August 2017, Plaintiff returned to Dr. Lu complaining of left shoulder pain "off and on [for a] few months" and pain with lifting her left arm. (Tr. 1177). On examination, Plaintiff's left shoulder was "mildly tender", without swelling, and with limited range of motion "due to pain". (Tr. 1183). Dr. Lu ordered an x-ray (Tr. 1183), which was normal (Tr. 1064).

Plaintiff returned to Drs. Askari and Ahmad at the end of August 2017. (Tr. 1057). She reported worsening fatigue, knee pain, and swelling. *Id.* She further described left shoulder pain, for which she had tried a steroid injection, and had not yet tried physical therapy. *Id.* Plaintiff's examination was similar to her May 2017 examination, with some additional tenderness to palpation over the right medial joint line. (Tr. 1062).

In September, Plaintiff returned to Dr. Anderson for diabetic shoes. (Tr. 1106). A few days later, Plaintiff reported pain in the small toes in both feet for which padding had not helped; she wanted surgery "to fix all 3 small toes now". (Tr. 1102). On examination, Plaintiff had "[s]everly painful" hammertoes at her third, fourth, and fifth digits on both feet; her second digits were "doing okay". (Tr. 1104). She had full muscular strength. *Id.* Dr. Anderson noted Plaintiff had "[f]ailed conservative treatment at this time", and had pain even with diabetic shoes and insoles. (Tr. 1105). At a visit with Ms. Such that same month, Plaintiff continued to complain of bilateral hip pain, bilateral leg pain, and bilateral feet pain; she rated her pain as five to six out of ten. (Tr. 1017). Plaintiff noted her upcoming surgery, described "whole body pain", which at times was "so bad she cries". *Id.* She further said she had a left frozen shoulder for which she underwent therapy. *Id.* Plaintiff again had eighteen out of eighteen fibromyalgia tender points, and Plaintiff described an improvement in her pain level with the switch to Lyrica. (Tr. 1019).

Plaintiff underwent surgery on her left foot ("arthroplasty digits 3, 4, 5") in October 2017. *See* Tr. 1097. Two weeks later, she had moderate edema; Dr. Anderson advised her to "return to comfortable shoe gear as tolerated or surgical shoe". (Tr. 1099).

In November, Plaintiff told Dr. Lu her leg swelling was unchanged. (Tr. 1168). On examination, she had a normal gait. (Tr. 1174). Later that month, Plaintiff told Dr. Anderson the tops of her feet were swollen for a week; her left foot hammertoes were "doing okay." (Tr. 1094). Dr. Anderson observed pitting edema of both feet, and diffuse pain in the dorsum foot. (Tr. 1096). She prescribed a Medrol dose pack, instructed Plaintiff to follow up with a rheumatologist for her "increasing arthritis symptoms", and prescribed a handicap placard. *Id.*

In January 2018, Plaintiff returned to Ms. Such, again reporting low back, bilateral hip, and bilateral leg pain; she rated the pain as six out of ten. (Tr. 1021). On examination, Plaintiff had fourteen out of eighteen fibromyalgia tender points. (Tr. 1023). Ms. Such noted Plaintiff was following up on "diffuse pain complaints", but that "[o]verall she [was] doing well". *Id.* That same month, Plaintiff told an endocrinologist that the "pain in [her] feet [was] less with methylprednisolone." (Tr. 594). Later that month, Plaintiff told Michelle Laugle, M.D. (in Dr. Askari's office) that she had six out of ten pain in her legs and feet. (Tr. 1044). She further reported persistent joint pain and swelling in her wrists, knees, and ankles, along with pain in her hips and lower back. *Id.* On examination, Plaintiff had full shoulder range of motion; joint hypermobility in her upper extremities; no active synovitis in her hands; tenderness to palpation in her finger joints; "bogginess" in her bilateral wrist joints, with tenderness on palpation and good range of motion; full lower extremity strength; "small cool effusion" in both knees, full range of motion, and no crepitus; moderate effusion in the bilateral ankle joints, with tenderness

11

and full range of motion; and no peripheral edema. (Tr. 1049). Dr. Laugle adjusted Plaintiff's medications and instructed her to return in four months. (Tr. 1054).

In March 2018, Plaintiff saw Dr. Anderson, reporting pain in the small toes of both feet for which padding had not helped. (Tr. 1088). Dr. Anderson noted surgery was scheduled for the following month. *Id.* On examination, Plaintiff had hyperkeratotic lesions in her plantar forefoot bilaterally, painful hammertoes at digits three, four, and five on the right foot, and third digit on the left foot. (Tr. 1090). She had full muscle strength and no joint pain. *Id.* Dr. Anderson's plan was debridement of the lesions, continue with shoe gear and orthotics, and surgery in April. *Id.*

Later that month, Plaintiff returned to Dr. Lu. (Tr. 1149). She was "[f]eeling all right except pains from [t]ooth/foot and [f]ibromyalgia." *Id.* Her gait was normal. (Tr. 1155).

In April, Plaintiff returned to Dr. Anderson with similar pain; Dr. Anderson noted Plaintiff's surgery was scheduled for April but cancelled due to diabetes complications. (Tr. 1085). Plaintiff described "like [her left ankle] is going to give out on her". *Id.* Her examination was the same as in March. (Tr. 1087). Dr. Anderson performed debridement of hyperkeratotic lesions, and dispensed a lace-up ankle brace. *Id.*

In May, Plaintiff returned to Dr. Askari's office to follow up on her lupus, Sjogren's, and fibromyalgia. (Tr. 1030). Notes indicate "no pain today". *Id.* Plaintiff said Methotrexate improved her joint pain. *Id.* Her examination was similar to her January 2018 visit. (Tr. 1036). Dr. Ahmad adjusted Plaintiff's medications, including a topical non-steroidal anti-inflammatory for Plaintiff's left knee pain. (Tr. 1040-41). He instructed Plaintiff to return in four months. *Id.*

In July, Plaintiff followed up with Ms. Such, again reporting "all over pain", including bilateral leg pain rated as six to seven out of ten. (Tr. 1025). Ms. Such wrote Plaintiff "[w]as able to travel to Florida this summer for several weeks". *Id.* She further noted Plaintiff had "been

without her Lyrica for 2 weeks and has increased pain without it." *Id.* Plaintiff had eighteen out of eighteen fibromyalgia tender points on examination. (Tr. 1027). In her assessment/plan section, Ms. Such noted Plaintiff was "[e]ssentially here to obtain her Lyrica." *Id.* She was to follow up in six months. *Id.*

> *Opinion Evidence*

In January 2017, State agency physician Diane Manos, M.D., reviewed Plaintiff's records and offered an opinion regarding her residual functional capacity. (Tr. 75). Dr. Manos opined Plaintiff could occasionally lift or carry twenty pounds, and frequently lift or carry ten. *Id.* She further opined Plaintiff could stand or walk for four hours in an eight-hour workday, sit for six, and operate bilateral foot controls occasionally. *Id.* Dr. Manos further opined Plaintiff could occasionally climb ramps/stairs, kneel, crouch, or crawl, frequently balance or stoop, and never climb ladders/ropes/scaffolds (citing Plaintiff's foot pain). (Tr. 75-76).

In April 2017, State agency physician Steve McKee, M.D., reviewed Plaintiff's records and concurred with Dr. Manos's opinion. (Tr. 88-89).

VE Testimony

A VE testified at the September 2018 hearing before the ALJ. (Tr. 57-64). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 59-60. The VE responded that such an individual could not perform Plaintiff's past work, but could perform other jobs such as polisher, ticket checker, and document preparer. (Tr. 60). The VE further stated that adding a limitation to frequent reaching, handling, and fingering with the bilateral upper extremities would eliminate the ticket checker position, but the VE offered the job of addresser in its place. (Tr. 60-61). If the limitation were reduced to occasional reaching,

handling, and fingering, no jobs would be available. (Tr. 61). The VE further testified that limitations of an individual being off-task more than ten percent of the time, or absent (including arriving late or leaving early) more than two times per month would be work-preclusive. (Tr. 61-62). In response to questions from counsel, the VE testified that adding a sit/stand option would not change her prior answers, as long as the individual remained at the workstation and on task. (Tr. 63) ("In my experience, they can all be done alternating sitting, standing, as needed.")

ALJ Decision

In his October 2018 decision, the ALJ first found Plaintiff had not engaged in substantial gainful activity since her August 24, 2016 application date. (Tr. 18). He next found Plaintiff had the following severe impairments: systemic lupus erythematosus; Sjogren's syndrome; joint hypermobility/hyperextensibility of multiple sites; fibromyalgia; osteoarthritis/degenerative joint disease of the bilateral knees; irritable bowel syndrome and esophageal reflux; hammer toes of the bilateral feet, localized edema, peroneal tendonitis of the right lower extremity and enchondroma of bone of the bilateral feet; CRPS of both lower extremities; deep venous thrombosis; and diabetes mellitus with diabetic polyneuropathy. *Id.* The ALJ, however, concluded that none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment. (Tr. 20). Thereafter, the ALJ set forth Plaintiff's RFC:

> [T]he claimant has the [RFC] to perform sedentary work as defined in 20 CFR 416.967(a) except: occasionally push and pull and operate foot controls with the bilateral lower extremities; never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs; occasionally kneel, crouch and crawl; frequently balance and stoop; should avoid all exposure to hazards such as unprotected heights, moving mechanical parts and the operation of motor vehicles.

(Tr. 20). The ALJ then concluded Plaintiff could not perform any past relevant work, but given her age, education, work experience, and RFC, jobs existed in significant numbers that Plaintiff could perform. (Tr. 22-23). Therefore, the ALJ found Plaintiff not disabled. (Tr. 24).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which

15

substantially limits an individual's ability to perform basic work activities?

3.     Does the severe impairment meet one of the listed impairments?

4.     What is claimant's residual functional capacity and can claimant perform past relevant work?

5.     Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff presents a single argument – she alleges the ALJ erred "because he relied upon the admittedly stale opinions of the non-examining State agency consultants to craft an RFC that does not properly account for Plaintiff's severe impairments." (Doc. 12, at 16). Specifically, Plaintiff contends the ALJ violated the principle set forth in *Deskin v. Commissioner of Social Security*, 605 F. Supp 2d 908, 912 (N.D. Ohio 2008) in formulating an RFC without seeking updated opinion evidence. For the reasons discussed below, the Court finds no error and affirms.

It is true that the only opinion evidence in this case are the State agency physician opinions January and April 2017 (*see* Tr. 75-76, 88-89), issued over one year before the ALJ's

September 2018 hearing and October 2018 decision. The ALJ in this case addressed the medical

evidence of record, as well as the opinion evidence:

> As for the opinion evidence, the State Agency concluded that the claimant retains the residual functional capacity for light exertional work, but further limited to standing/walking at 4 hours in an 8-hour workday and occasional bilateral foot controls. She could occasionally climb ramps/stairs, but never climb ladders, ropes or scaffolds. She could frequently balance and stoop, but occasionally kneel, crouch, and crawl (1A/3A). I [give] some weight to the State Agency opinion, insofar as, the record supports that the claimant has significant limitations in standing and walking and the use of foot controls due to her severe impairments. However, the evidence received at the hearing level supports that the claimant is more limited exertionally than the State Agency determined. Specifically, the continued pain in her feet supports relegating the claimant to a reduced range of work at the sedentary exertional level.
>
> The records reveal that the claimant has Sjogren's syndrome, fibromyalgia, joint hypermobility, SLE, osteoarthritis, hammer toes bilaterally, complex regional pain syndrome, DVT, and diabetes mellitus. The claimant routinely complains of fatigue, joint pain and swelling, and pain with walking. Many of the complaints related to the claimant's chronic pain and difficulty sleeping, which she reports medication controls somewhat (18F; 19F). The claimant received treatment from a primary care doctor and specialists for her severe impairments, as well as maintenance medication, which helps control her disorders, pain and discomfort (10F/22; 18F/3, 19; 19F/2, 16, 26; 21F/11; 97; 179; 187). The claimant reportedly did not receive relief from pain through physical therapy (18F/19). X-rays of the left shoulder from August 2017 were normal (19F/36). The claimant received surgery on her feet in 2016 for benign enchondroma of the bone, later debridement of her feet lesions, and her treating podiatrist dispensed an[] ankle brace, shoe gear and orthotics. She had surgery on her left foot in October 2017. The claimant scheduled surgery for correction of her hammertoes at the right foot but her Hba1c level and elevated blood sugar level preclude the surgery (2F; 18F; 20F). The claimant's diabetes mellitus was mostly well-controlled, though her chronic use of steroids for foot pain affected her blood glucose and she adjusted her medication accordingly (10F).

(Tr. 21-22).

A claimant's RFC is defined as "the most [she] can still do despite [her] limitations." 20

C.F.R. § 416.945(a)(1). The determination of RFC is an issue reserved to the Commissioner. 20

C.F.R. § 416.927(e)(1)(i). However, it must be supported by substantial evidence. In formulating

the RFC, the ALJ is not required to adopt any physician's opinion verbatim. 20 C.F.R. §

416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment.").

In *Deskin*, another Judge of this court found "where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations . . . to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." 605 F. Supp. 2d at 912. Further, the court explained, "the ALJ may not interpret raw medical data in functional terms." *Id.* However, *Deskin* also provided that "[a] medical source may not be necessary in every case". *Id.*

*Deskin* has been "criticized by other judges within this District", *Adams v. Colvin*, 2015 WL 4661512, at *15 (N.D. Ohio). Specifically, a court found that "*Deskin* . . . is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." *Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222, at *2 (N.D. Ohio). In so holding, the court relied upon the statutes requiring an ALJ—not a physician—to determine a claimant's RFC based on the evidence as a whole. *Id.* (citing 20 C.F.R. §§ 416.946(c), 416.927(e)(2); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96–5p, 1996 WL 374183, SSR 96–8p, 1996 WL 374184). Courts applying *Deskin* have further narrowed it to detail that it "'applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence.'" *Snell v. Comm'r of Soc.*

*Sec.*, 2019 WL 3406435, at *3 (S.D. Ohio) (quoting *Kizys v. Comm'r of Soc. Sec.*, 2011 WL

5024866, at *2 (N.D. Ohio) (clarifying *Deskin*)).

Plaintiff contends "the lack of any medical opinion evidence for Plaintiff's physical

impairments, apart from two outdated opinions from non-examining physicians, denotes a lack

of substantial evidence supporting the RFC." (Doc. 12, at 23). But, as discussed below, the Sixth

Circuit has more recently repeatedly indicated to the contrary. As it explained in 2017:

> Shepard also argues that the ALJ's RFC lacks substantial evidence because no
> physician opined that Shepard was capable of light work. But "the *ALJ is charged
> with the responsibility of determining the RFC based on her* evaluation of the
> medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x
> 719, 728 (6th Cir. 2013) (emphasis added). An RFC is an "administrative
> finding," and the final responsibility for determining an individual's RFC is
> reserved to the Commissioner. SSR 96-5p, 1996 WL 374183, at * 1–2 (July, 2,
> 1996). "[T]o require the ALJ to base her RFC on a physician's opinion, would, in
> effect, confer upon the treating source the authority to make the determination or
> decision about whether an individual is under a disability." *Rudd*, 531 F. App'x at
> 728.

*Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017). In 2018, the court

said: "We have previously rejected the argument that a residual functional capacity

determination cannot be supported by substantial evidence unless a physician offers an opinion

consistent with that of the ALJ . . . . We similarly find no error here. The ALJ undertook a

laborious evaluation of the medical record when determining the residual functional capacity,

and substantial evidence supports the ALJ's conclusions." *Mokbel-Aljahmi v. Comm'r of Soc.

Sec.*, 732 F. App'x 395, 401-02 (6th Cir. 2018) (rejecting the argument that "once the ALJ

decided to give no weight to the physicians' opinions regarding his ability to work, the ALJ was

required to get the opinion of another physician before setting the residual functional capacity");

*see also Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line

rule exists in our circuit directing that medical opinions must be the building blocks of the

residual functional capacity finding, but the administrative law judge must make a connection between the evidence relied on and the conclusion reached.").

Further, the Sixth Circuit has held "an ALJ may rely on the opinion of a consulting or examining physician who did not have the opportunity to review later-submitted medical records if there is 'some indication that the ALJ at least considered these facts' before assigning greater weight to an opinion that is not based on the full record." *Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 493–94 (6th Cir. 2016) (citing *Blakley*, 581 F.3d at 409); *see also McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) ("McGrew also argues that the ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical condition. It is clear from the ALJ's decision, however, that he considered the medical examinations that occurred after Dr. Starkey's assessment . . . including Dr. Goldstick's contrary assessment, and took into account any relevant changes in McGrew's condition.").

Here, the ALJ recognized the State agency physician opinion were somewhat outdated, assigned them "some" weight, and proceeded to proscribe a more restrictive RFC because of the "continued pain in [Plaintiff's] feet." (Tr. 22). Specifically, in contrast to the State agency physicians' assignment of a light exertional RFC, the ALJ limited Plaintiff to sedentary work; he also added environmental limitations not offered by the State agency physicians. *Compare* Tr. 75-76 and 88-89 *with* Tr. 20 (RFC requiring avoidance of "all exposure to hazards such as unprotected heights, moving mechanical parts and the operation of motor vehicles.").

It is also clear that this ALJ considered the post-dated medical evidence. *See Spicer*, 651 F. App'x at 493–94; *McGrew*, 242 F. App'x at 32. The ALJ cited Plaintiff's ongoing treatment records, noting she received treatment from a variety of physicians "as well as maintenance

medication, which helps control her disorders, pain and discomfort". (Tr. 20). This is supported by the records cited, many of which post-date the State agency physician opinions. *See* Tr. 594 (January 2018 – "pain in feet is less with methylprednisolone"), Tr. 994 (July 2018 – "At this point she does not seem to be particularly having a flare as result of complex regional pain syndrome. Apparently she is doing relatively well compared to previous surgeries on her foot. However she still has severe pain."), Tr. 1010 (March 2017 – noting medications of Gabapentin, Percocet, and Topamax), Tr. 1030 (May 2018 – follow up for lupus and fibromyalgia, with note of "no pain today", and indication Methotrexate improved Plaintiff's joint pain), Tr. 1044 (January 2018 – noting temporary pain relief with Medrol packs), Tr. 1054 (January 2018 – prescribing Medrol pack as needed, and noting Plaintiff took Lyrica for fibromyalgia per pain management), Tr. 1149 (March 2018 – noting Plaintiff was "[f]eeling all right except pains from Tooth/foot and Fibromyalgia"), Tr. 1235 (March 2016 – "[f]eeling all right except for various pains incl RLE which has a walking boot on"; also noting that Effexor and "GABA" helped), Tr. 1317 (April 2015 – noting insomnia, but "[t]aking rest of meds regularly"), Tr. 1325 (March 2015 – pain and swelling in lower leg, "pain med helps"). This statement is further supported by other evidence of record. *See* Tr. 1074 (May 2017 – Dr. Ahmad recommending Plaintiff "gradually increase aerobic activity" and that she was using a fitness tracker and doing 3000 steps daily), Tr. 1019 (September 2017 – report of improvement in pain with Lyrica prescription), Tr. 1023 (January 2018 – describing "diffuse pain complaints ", but "[o]verall she is doing well"), Tr. 1027 (July 2018 – noting Plaintiff was "[e]ssentially here to obtain her Lyrica" after reporting increased pain after running out).

Moreover, the ALJ cited Plaintiff's normal August 2017 shoulder x-ray (Tr. 21) (citing Tr. 1064), as well as her October 2017 left foot surgery (Tr. 21); *see also* Tr. 1097. He further

noted her treating podiatrist "dispensed an[] ankle brace, shoe gear and orthotics." (Tr. 21); *see* Tr. 1115 (ordering diabetic shoe gear), Tr. 1109 ("[d]ispensed crest pad to try"); Tr. 1099 (advising Plaintiff post-October 2017 surgery to "return to comfortable shoe gear as tolerated or surgical shoe"); Tr. 1090 (advising Plaintiff to continue with shoe gear and orthotics); Tr. 1087 (performing debridement of hyperkeratotic lesions and dispensing an ankle brace).

Plaintiff correctly points out she was diagnosed with, and treated for, fibromyalgia after the State agency physicians offered their opinions. She further cites, generally, Sixth Circuit law regarding fibromyalgia. *See* Doc. 12, at 21. But the ALJ recognized this diagnosis, finding it to be a severe impairment. *See* Tr. 18. And "disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). The claimant in a Social Security case bears the burden of demonstrating the need for a more restrictive RFC. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). Here, Plaintiff has not pointed to any physician offering any specific limitation based on fibromyalgia, nor does she articulate any specific limitation – stemming from these diagnoses or otherwise – that she contends should have been included in the RFC. The ALJ's opinion makes clear he considered the medical opinions, and other evidence, in the record and came to his own conclusion regarding Plaintiff's RFC, precisely as the regulations require. *See* 20 C.F.R. § 416.946(c).

Further, there is no evidence in this case that the ALJ interpreted "raw medical data", as with the MRI evidence in *Deskin*, 605 F. Supp 2d at 913. Rather, the later evidence consisted – as described above – of Plaintiff's complaints of pain and her physicians' treatment thereof. *See Chamberlin v. Comm'r of Soc. Sec.*, 2020 WL 2300240, at *3 (E.D. Mich.) ("Contrary to Chamberlin's assertion, this is not an instance in which the RFC is based on the ALJ's own

interpretation of raw medical data. Much of the evidence that the ALJ reviewed was not complicated diagnostic and/or highly-specialized medical data that requires professional training to interpret (e.g. MRIs, ultrasounds and other mechanized diagnostic testing). Rather, the ALJ considered a large amount of objective medical findings that can be translated into functional limitations, even by a lay person."). And, as described in further detail above, the ALJ recognized this treatment at least somewhat alleviated Plaintiff's pain. *See* Tr. 21.

If it can be supported for an ALJ to reject all medical opinion evidence of record and formulate an RFC based on the record as a whole, *see Mokbel-Aljahmi*, 732 F. App'x at 401-02, then it certainly can also be supported for an ALJ to rely (in part) on outdated medical opinions without obtaining updated opinion evidence, so long as the ALJ's ultimate decision is supported by substantial evidence. *See McGrew*, 343 F. App'x at 32 ("McGrew also argues that the ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical condition. It is clear from the ALJ's decision, however, that he considered the medical examinations that occurred after Dr. Starkey's assessment . . . including Dr. Goldstick's contrary assessment, and took into account any relevant changes in McGrew's condition.").

Given the Sixth Circuit's recent pronouncements noted above, *see Shepard*, 705 F. App'x at 442-43, *Mokbel-Aljahmi*, 732 F. App'x at 401-02, *Rudd*, 531 F. App'x at 728, the Court finds the ALJ did not err in determining the RFC without seeking additional medical opinion evidence. That is, it was reasonable for the ALJ to review the record as a whole – including the records post-dating the opinion evidence – and determine Plaintiff was somewhat more limited than the State agency physicians opined, but not completely disabled. Much of the evidence to which Plaintiff points involves pain her feet, legs, and knees. The ALJ's RFC accommodates these

restrictions by limiting Plaintiff to a reduced range of sedentary work with postural restrictions. In short, although Plaintiff can point to evidence in the record in support of her general contention that she is more limited, the Court finds that the ALJ applied the appropriate legal standards and his conclusion is supported by substantial evidence. *See Jones*, 226 F.3d at 477 (Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ.").

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI supported by substantial evidence and affirms that decision.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE